**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| THOMAS ROSENBAUM, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:06-CV-352-TLS |
| | ) | |
| CHAD SEYBOLD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

The Plaintiffs in this lawsuit are investors who contributed, in total, more than $1 million in capital for the purpose of buying, rehabilitating, remortgaging, renting, and eventually selling homes in Marion, Indiana. After the Plaintiffs learned that their investment money had disappeared without any return, having potentially been mismanaged and misappropriated, they sued the business ventures, entities, and individuals they believed were legally responsible for their losses. This included attorneys Beau Jack White (White) and James Thomas Beaman (Beaman), and the law firm of Johnson, Beaman, Bratch & White, LLP (the Law Firm) (collectively the Defendants). The claims included, among others, legal malpractice, violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), violations of § 10(b) of the Securities Act of 1934 and Rule 10b-5, violations of Indiana and Michigan securities laws, fraud, and conspiracy. This matter comes before the Court on Defendants Beau Jack White, James Thomas Beaman, and Johnson, Beaman, Bratch & White, LLP's Motion for Summary Judgment [ECF No. 410] and the Plaintiffs' Amended Countermotion for Summary Judgment [ECF No. 434].

**BACKGROUND**

The Plaintiffs, Thomas Rosenbaum, Gary Kasaczun, Joni Kasaczun, Robert Sexton, Delene (sometimes referred to as Delen) Tennyson, William Method, Rick Sandusky, Elizabeth Sandusky, Veying Tone, William Lisowski, Julie Lisowski, Ron Hood, Royce Whang, Sean Smolski, Lucinda Orwoll, Elizabeth Stern, the Edgar C. Jones Living trust, Sandusky, LLC, RFL Financial, LLC, Seytron Property Holding, LLC, and Seytron Investors No. 1, LLC, initiated this cause of action on October 26, 2006. On August 1, 2007, the Plaintiffs filed their Fourth Amended Complaint [ECF No. 168].[1] The Fourth Amended Complaint named more than 15 defendants, asserted 19 causes of action, and contained 238 numbered paragraphs. By June, 2010, when White, Beaman, and the Law Firm filed their Motion for Summary Judgment, they were the only remaining Defendants in the case. In their Motion, they argued that they were entitled to summary judgment on the Plaintiffs' RICO, conversion, securities fraud, common law fraud, conspiracy, and attorney malpractice claims. On October 18, the Plaintiffs responded to the Motion for Summary Judgment and filed their own Motion for Summary Judgment [ECF No. 434]. In the midst of briefing the summary judgment motions, White filed a Motion to Stay and Notice of Chapter 7 Bankruptcy. The Court stayed the claims against White [ECF No. 449], but later amended the stay consistent with the bankruptcy court's order on the Plaintiffs' Motion for Relief from Automatic Stay, which granted the Plaintiffs permission to continue their litigation against White solely for the purpose of establishing his liability and the right to recover from his malpractice insurance carrier [ECF No. 455]. The bankruptcy court's relief from the stay was

---

[1] The Court will discuss the previous versions of the complaint as necessary in the analysis section of this Opinion.

limited to the claims against White that were covered by his liability insurer, although those claims were never specifically identified other than in the Plaintiffs' Motion for Relief from the Automatic Stay, which referred to "legal malpractice, negligence and other claims covered by the Policy." (ECF No. 451-1 at 2.)

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure state that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The motion should be granted so long as no rational fact finder could return a verdict in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249–50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). According to Rule 56:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

With cross motions, the court must construe all facts in a light most favorable to the party against whom the motion under consideration is made. *see Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir. 2003). "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008).

## STATEMENT OF FACTS

**A.    Documents Drafted by the Defendants for Formation of Seytron Investment Companies**

Chad Seybold hired the Law Firm to draft papers for two of his business entities, Seytron Property Holding, LLC (Seytron Property Holding) and Seytron Investors No. 1, LLC (Seytron Investors) (collectively the Seytron Investment Companies). Beaman drafted Articles of Organization for the Seytron Investment Companies, which he filed with the Indiana Secretary of State, Operating Agreements for the Seytron Investment Companies, and a Subscription and Loan Agreement. The following facts detail the Defendants' involvement with Seybold's business ventures.

In March 2005, Seybold contacted White by email and explained how he was putting together a plan to purchase and rehabilitate properties in Marion, Indiana, and that he was seeking investment capital. Seybold stated that he needed corporate documents prepared and filed and needed contract documents for investors. White, who did not have much experience with business matters, forwarded Seybold's email to Beaman, a general practitioner who had been practicing law in Indiana since 1970. On April 1, Beaman met with Seybold to discuss forming the companies. Beaman understood that Seybold and two other individuals were to be the members of Seytron Property Holding, which would hold 51% ownership in Seytron

Investors. The remaining 49% ownership interest in Seytron Investors would be divided among eight to ten unknown individuals who would each invest $1,000. Seytron Investors would then borrow up to $400,000 from a local financial institution with the individuals providing security for the loan. Seytron Investors would purchase up to three houses for rehabilitation with the goal of later selling them for a profit. Beaman understood that the individual investors were to participate in all aspects of the plan, including selection of the homes, the loan process, and the sale of the homes. Some of the concerns that Seybold and Beaman discussed with regard to formation of the Seytron Investment Companies and the investment plan included what Federal and State securities laws might apply, and how best to protect the individual investors.

On April 9, Seybold had a second meeting with Beaman and White at the Law Firm. The timing of the April 9 meeting coincided with the first investment seminar that Seybold was going to hold later that day to present his plan to potential investors.[2] The topics discussed during the meeting included how to avoid securities laws by keeping the amount of investments below $500,000 per project and making the companies member-managed, the complexity of the operating agreements to be drafted, the need for profits realized on investment properties to immediately pay down all existing lines of credit, the interrelation of the various entities, the need to limit holding companies to no more than three properties per LLC, and the use of CDs as collateral to protect investments and to avoid securities laws. They also discussed whether a management committee composed of the investors should be created, the rights of investors to pull out their investments, and a provision for the mandatory hiring of Seycad Construction, LLC (Seycad), a company owned by Seybold. A potential investor, Victor Whang, was also present

---

[2] The seminar will be discussed in more detail later in this Opinion.

during some portion of the meeting. Seybold had met Whang in 2003 and knew him to be interested in investing in real estate. Seybold had already told Whang about his plan and that he was soliciting potential investors. Whang testified that he went to the Law Firm with Seybold because Seybold was proud of the fact that he had hired lawyers to draw up all the documents and make sure that everyone was protected and he wanted Whang to meet them.

On April 27, Beaman organized the Seytron Investment Companies on the basis of the information Seybold provided with regard to the number of anticipated members, the amount of capital contribution from each member, the involvement of the prospective members in the management of Seytron Investors, and the average knowledge and level of sophistication of the anticipated members. The Articles of Organization identify Seytron Investors and Seytron Property Holding as "L.L.C.'s" and as unincorporated associations pursuant to the Indiana Business Flexibility Act, Ind. Code § 23-1-18 *et seq.* Beaman also drafted Operating Agreements for the two entities. The final page of the Operating Agreement for Seytron Investors (the entity that was anticipated to have eight to ten investors in addition to Seytron Property Holding) contains blank lines for members and witnesses to sign. Above the signature lines it reads: "**WE CERTIFY THAT WE HAVE READ THE ABOVE OPERATING AGREEMENT IN DETAIL AND HAVE HAD THE OPPORTUNITY TO REVIEW SAID OPERATING AGREEMENT WITH OUR LEGAL COUNSEL AND/OR ACCOUNTANT.**" (Operating Agreement 13, ECF No. 427-46.) The Operating Agreement for Seytron Investors contained a blank signature line for Seytron Property Holding "by Chad Seybold" and for nine other

unidentified members. (*Id.*) Beaman and White were not made aware who, if anyone, signed the Operating Agreements.[3]

Shortly thereafter, Beaman performed work for Seybold again, in May 2005, when he drafted a proposed form for a Subscription and Loan Agreement after Seybold told him that various individuals were considering purchasing a unit of membership in Seytron Investors, and that they were willing to guarantee or collateralize a loan at a local financial institution. Also, in June, Beaman drafted an unsecured promissory note for Seytron Property Holding.

The Defendant's billing statements to Seybold evidence their work for meeting with Seybold, researching securities laws, attending the first seminar, preparing and filing the incorporation documents, drafting the Operating Agreements, drafting a subscription and loan agreement, and preparing the promissory note. The Defendants invoiced Seybold for attorneys' fees in the amount of $3,716.25 (excluding filing fees) for work performed from March 21, 2005, to June 23, 2005. (*See* Invoices, ECF No. 427-67.)


**B.     The Private Offering**

When Seybold talked to potential investors, he provided them a written description of the investment in a private offering, worded as follows or substantially similar to the following:

> Seytron, LLC is an equity real estate company whose main function is to acquire, rehab, and rent homes to the general public. Seytron, LLC operates as a partnership under the direction of Chad Seybold.
> Seytron, LLC is operated with the help and direction of quality employee's dedicated to rehabbing quality properties. Chad Seybold is in charge of the general

---

[3] The Operating Agreement exhibits contained in the summary judgment record do not contain any signatures. Moreover, the Plaintiffs have presented evidence that Seybold did not deposit the money they contributed into Seytron Investors and that Seytron Investors never owned any real estate.

operation of the business. His role is to design and manage financing and profitability of each project. John Seybold is the Project Manager. His role is to manage the day to day activity and control the quality of construction. John is also responsible for the day to day management of purchasing supplies and
maintaining cost. Lupe Cadena is our lead contractor. Lupe controls all construction and day to day maintenance of Seytron, LLC properties. Lupe is a captive contractor to Seytron, LLC. John Varraro is our property manager. John is responsible for managing the rental process and controlling rent collection for Seytron, LLC.

Seytron, LLC currently has an inventory of 13 rental units in the Marion, IN area. These properties are comprised of single family properties, duplex properties and commercial buildings. These properties are in established neighborhoods and are market focused on labor, and blue-collar classes.

Seytron, LLC is currently seeking funding for continued acquisition of new properties and maintenance on our current properties. We will follow the same basic formula for every property that we acquire. The format is to purchase a home at auction or through a private buyer. Rehab the said property to acquire its top appraisal value. Refinance the property up to 70% or 80% of the new appraised value. Rent the property for $100 - $200 positive rental equity. Seytron, LLC expects to maintain a minimum positive cash flow of $10K - $20K per property as well as positive rental equity of $100 - $200 per home per month. Seytron, LLC is seeking investment capital to fund our future expansion. Seytron, LLC will create an investment company in which it will sell off 49% of the organization. The company will be sold in 1% increments at the value of $18,000 per unit. Seytron, LLC would like to maintain a minimum of 6 units be purchased
by each investor. The $450,000 investment will allow Seytron, LLC to use these dollars as its line of credit to purchase and rehab properties. The properties are purchased for typically between $500 and $25,000 per home. The homes then need to have between $10,000 and $40,000 worth of rehabilitation. We attempt to maintain net cash out of $10,000 to $20,000 per house by taking the property to cash out mortgage position of 70%-80% of its new appraised value. The $450,000 will be a revolving line. When a house is completed and the cash out mortgage is taken the rehab and purchase money will be repaid to the line of credit leaving the
profit from the home in the Investment account. After the cash out mortgage is finished, Seytron, LLC will take 20% of the net profit as a management and maintenance fee the remaining net revenue will be placed in the Investment account. All monies over and above the initial $450,000 investment will be divided by ownership percentage at the end of each year. All properties purchased are owned in full by the Investment group. Each investor will have the right to
request a buyout of their investment portion at the end of each year. At time of termination the houses that are being rehabbed will be finished and after completion the initial investment would be returned.

Seytron, LLC and the Investment group will operate as a profit company that derives its profits from the refinancing of homes and rental equity on the following basis.

(Private Offering, Ex. 55 at 1-3, ECF No. 427-55.) The Defendants had no part in the creation of this document, nor were they informed that Seybold planned to give it to potential investors. The Defendants were not involved in the formation of Seytron, LLC.

**C.     The First Investment Seminar**

Seybold made his first sales pitch to potential investors on April 9, 2005, in Marion, Indiana. Whang, who was interested in investing on behalf of his mother and on behalf of Veying Tone, Mr. and Mrs. Rosenbaum, and Mr. and Mrs. Sandusky attended the first investment seminar. Seybold handed out copies of the private offering, the PowerPoint Presentation he was going to follow during the seminar, and information on various properties in Marion. He began his presentation by introducing his team of participants and presenters. He identified Wayne Seybold as his brother and the mayor of Marion, John Seybold as his father and an experienced adjuster, Lupe Cadena who was his partner in Seycad, and an insurance agent. He introduced White and the Law Firm as legal counsel. During his presentation, Seybold highlighted protections that any investors would have, including a term life and disability policy to replenish their investments in the event of an accident, segregation of investment money from Seybold's other projects and companies, limitations on the number of investment properties each holding company could hold, paying off the line of credit first, and replenishment of investment money.

After Seybold's portion of the presentation was finished, he asked White to talk to the group about limited liability companies. White had come to the seminar for this particular purpose. Someone in attendance raised a concern about potential conflicts of interest and

competition with Seybold's other projects. White explained that those issues could be handled in the Operating Agreements if that was desired. White also told the group that he and Beaman had found a way to structure the companies to avoid SEC entanglements and were still looking into those issues. Seybold added his own thoughts to this statement, stating that they were trying to stay out of SEC red tape as much as possible to avoid costs to everyone involved, and represented that the cost of a private placement was about $20,000 to $30,000.[4] In answer to a question about exposure to personal liability, White assured the group that because any companies formed would be set up and run as limited liability companies and it was extremely difficult in Indiana to pierce the corporate veil, the only money the investors risked losing was their investment money. Seybold then gave the following assurances to the potential investors:

> I think the other important thing to note here is—that you've got to remember is—that [the lawyers] don't represent me. They represent Seytron Property Holdings, okay? That means they represent you as well. So [counsel is] not only looking out for my best interest, but they're looking out for your best interest as well and my best interest also as a partner in this group. So it's not like . . . I don't want anybody to get the impression that they're setting this up to where it benefits me and that you guys are going to be left hanging in the breeze. The total discussion that we've had is that I'm part of an owner in Seytron Property Holdings just like you and your interest needs to be protected first to make sure that your dollars are safe and then second that we're protected as a group both in our personal lives as well as within the company. So, these guys [referring to counsel] are working for you just like they are working for me.

(Video Recording of April 9, 2005, Seminar, Pls.' Ex. 63 at 1:07:00-1:09:00.) White, who was standing next to Seybold when he made these statements, did not clarify, correct, or comment on them.

---

[4] In their Brief, the Plaintiffs attribute this statement to White. The Court's review of the video recording of the first seminar shows that it was Seybold who talked about the price of a private placement. (*See* Pls.' Ex. 63, DVD of April 9, 2005, Seminar, filed manually pursuant to ECF No. 425.)

Mr. Rosenbaum talked to White briefly after the presentation to introduce himself. According to Mr. Rosenbaum, White gave him a business card and indicated that he would be representing the investors group. Mr. Rosenbaum took this to mean that White would represent the people who would potentially invest in Seytron Investors. White also gave his business card to Mrs. Sandusky and, according to Mrs. Sandusky, reaffirmed that he was "our attorney and was there to protect our interests." (Elizabeth Sandusky Dep. 55–56, ECF No. 411-9.) Mr. Sandusky did not talk to White. Whang testified that after the seminar White reaffirmed representations from the seminar and their pre-seminar meeting, which was that White and Beaman were the lawyers "drafting the documents and things like that" and were the guys "taking care of us." (Whang Dep. 76, ECF No. 427-27). After the presentation, Seybold took the potential investors on a tour of Marion with his brother Wayne.

## D.     Other Investors and Seminars

### 1.     *Joni and Gary Kasaczun*

Gary Kasaczun learned of Seybold's real estate investment opportunity through Whang, his personal broker. Rhonda McCluskey, who taught a real estate class in the Kasaczun's home in 2005, also told Mr. Kasaczun about Seybold's plan and asked if he wanted to be included. Mr. Kasaczun indicated he was interested and McCluskey brought Seybold and Whang to the Kasaczun's home in the Spring 2005. Seybold gave a presentation like the one he made at the first seminar and provided the Kasaczuns with a copy of his power point presentation. Seybold told them that he was putting the plan together, including having a law firm draft paperwork because he was going to be buying shares of the investment company. Seybold invited the

Kasaczuns to Marion to see the potential properties and said that by midsummer he would have all the paperwork in place to start the investing.

In July 2005, the Kasacsuns went to Marion and joined a group of potential investors to listen to Seybold's investment presentation and tour Marion. Seybold said the paperwork was nearly complete and that White and Beaman were the attorneys putting the company together and putting protections in place for the investors. Neither White nor Beaman were at the presentation. At one point during the three to four hour tour of Marion, Mr. Kasaczun pulled Seybold aside and said that from everything Seybold had told him, it appeared to be a "gold mine" and asked if the investment opportunity was "for real." (Gary Kasaczun Dep. 38, ECF No. 427-24.) Seybold responded that it was and that was why he had enlisted the law firm to protect the investors' interests and do it right the first time so there were no mistakes and everyone made money down the road. After the tour and after Seybold wrapped up his presentation, he gave White's business card to Mr. Kasaczun and said White and Beaman were working on the company documents and would be looking out for the investor's interests, and he could call White with any questions or concerns. Whang told Kasaczun that when Whang was in Marion for an earlier presentation White was present at the meeting and told everyone that the Law Firm was looking out for the interests and making sure that it was safe and sound investment for all involved.

The Kasaczuns returned home and shortly thereafter decided to invest in Seybold's company. When they purchased their shares on August 1, 2005, they were again assured that the Law Firm had put the documents together or approved them, that it was legal, and that the attorneys were there to protect their investment. The Kasaczuns did not attempt to contact White,

12

Beaman, or the Law Firm until Fall 2006 after Seybold called a meeting to tell the investors that the money they invested was gone.

2.      *Edgar C. Jones Living Trust*

The Edgar C. Jones Living Trust was set up for Mrs. Kasaczun's father. The trustees are Mrs. Kasaczun and Delene Tennyson. On the advice of Mr. Kasaczun, Mrs. Kasaczun and Tennyson decided to invest trust funds in Seybold's company.

3.      *Robert Sexton*

Robert Sexton first learned of the Marion investment opportunity when Seybold came to a real estate class conducted by McClusky and Whang sometime in 2005. Seybold explained that an initial investment group running the investment would maintain control with 51% ownership, but the group would make 49% available to other investors. Seybold made various representations concerning mitigated risks, including that legal counsel was going to represent everyone and not just Seybold. Whang also made a representation to Sexton before he invested that the lawyers would be representing the Seybold companies and would be there to represent "all of us and help manage our business and protect our interest." (Robert Sexton Dep. 140, ECF No. 427-23.) Later, Sexton called Seybold to tell him he had decided to invest. On August 22, 2005, Whang handled the investment paperwork.

Sexton never met or talked to White, Beaman, or any other lawyer from the Law Firm and did not have their contact information.

**4.** *Elizabeth Stern*

Elizabeth Stern learned about Seybold's Marion investment opportunity through her fiance's mother, Delene Tennyson. She invested upon the advice of Tennyson and Whang, who was Tennyson's financial broker. She did not have any conversations or communications with White, Beaman, or any other attorney from the Law Firm. After this lawsuit was filed, Stern understood that White was the "attorney that was supposed to be protecting us," but knows nothing else about him or his role in the investment. (Elizabeth Stern Dep. 29, ECF No. 411-7.)

**5.** *William Method*

William Method took a real estate investing class at the home of the Kazacsuns where he heard about the Marion investment opportunity from Whang and McClusky. He then met Seybold at the Kazacsums' house and within a few months decided to invest. The Kazacsums, Tennyson, and Whang told him that a law firm was watching over Seybold. Method has never talked to or met White, Beaman, or any lawyer from the Law Firm.

**6.** *Delene Tennyson*

Delene Tennyson was one of the participants in the real estate class conducted by McClusky and Whang. In April or May 2005, she learned from Whang that he and McClusky were looking into a real estate investment opportunity in Marion. Tennyson met Seybold at the Kazacsums' home where Seybold represented that he had a "very good reliable law firm that he dealt with that would protect our interest." (Delene Tennyson Dep. 38, ECF No. 411-11.) Tennyson did not have any personal contact with White, Beaman, or any other lawyer from the

Law Firm, but knows that White and Beaman were "part of the law firm that was supposed to be representing us." (*Id.* at 90–91).

**7.**     *William and Julie Lisowski*

William and Julie Lisowski learned that the Kazacsums had invested in Seybold's investment opportunity in Marion and asked Whang, their personal broker, about the investment. Whang indicated that he was excited about it and arranged for a telephone meeting between himself, the Lisowski's, and Seybold. During that telephone conversation in January 2006, Seybold mentioned that attorneys were drawing up the paperwork and contracts that would have to be signed, and that their interests were protected. The Lisowskis did not meet or talk to White, Beaman, or any other lawyer from the Law Firm.

**8.**     *Lucinda Orwoll*

Lucinda Orwoll learned about the Marion real estate investment opportunity through Whang, who was her investment advisor. Orwoll met Seybold on three occasions to talk about the investment. She did not meet White or Beaman, or even hear their names before she invested, but Whang told her that he had met with lawyers in Marion and assured her that their interests were protected. Based on representations from Seybold and Whang, Orwoll now believes that White and Beaman were the attorneys for the investment group.

**9.**     *Ron Hood*

Whang was Ron Hood's personal broker. In Fall 2005, Hood participated in a conference call with Whang and Seybold where he learned about the Marion investment opportunity. Seybold told him that he had put together a team of professionals to help with investors outside Marion, including banks, laborer, and lawyers. Hood never met or talked to the Defendants either before or after he invested with Seybold.

**10.** *RFL Financial, LLC*

Ray Leggett is one of about ten members of RFL Financial, LLC, which was formed specifically for the purpose of investing money with Seybold. The remaining members are his family and friends. Leggett made several trips to Marion to investigate the real estate investment opportunity. Seybold gave a presentation very similar to the one he gave during the first seminar to the members of RFL. During one trip, he met White at the Law Firm. Leggett testified that the following was his understanding of the Law Firm's role in the investment plan:

A. That they were a safeguard for the investors, that they were our legal firm.
Q. What is it that led you to believe that they were your legal firm?
A. Very simply, I was told that, A. When I was introduced to [White], I'm a jocular type of personality, I like to say jokes and phrases as introductions, and I believe what I said to the attorney was something like, so you're the famous lawyer that I've heard is working for us. I shook his hand. He said, yes, hello. [Seybold] introduced us. I was also told by [Seybold] himself in front of him that, yes, this is the law firm that is working on our behalf for you, for the investors. Now that leads me to believe that, A, that is our attorney.

(Leggett Dep. 64–65, ECF No. 427-28.)[5] Besides this introduction, Leggett did not have any other contact with White or Beaman before he invested or any other reason to believe that the Defendant's were his legal counsel.

11.    *Sean Smolski*

Sean Smolski learned about Seybold's Marion real estate investment opportunity at a lunch with Ray Leggett and Seybold on April 4, 2006. Leggett arranged the lunch and Seybold presented his plan. Smolski never heard the Defendants' names prior to the date of his deposition for this lawsuit.

12.    *Royce Whang and Veying Tone*

Whang has power of attorney for his mother, Royce Whang, because she has dementia, and he signed all of the investment papers on behalf of his mother. Whang also convinced Tone, one of his clients, to invest and completed all of the communications related to the investment.

E.    **Contact with the Defendants After the Seminar**

Mr. Rosenbaum tried to contact White in late fall 2006 after his repeated attempts to communicate with  Seybold had failed. Shortly thereafter, Seybold contacted Mr. Rosenbaum. Leggett also called the Law Firm when he could not contact Seybold. In September or October 2006, the Plaintiffs learned that their investment money was gone. Seybold told them that he was

---

[5] Although Leggett's testimony suggests that he had more than one reason to believe that the Defendants were his legal counsel, he only testified to the one.

filing for bankruptcy, getting a divorce, and turning the properties over to the investors. He explained that the plan had not worked because rehabilitation costs were too high, suppliers stopped allowing him to order on credit, the market had taken a downturn, property values dropped, and refinancing was nonexistent. Upon learning of the venture's failure, none of the Plaintiffs talked to White or Beaman and they decided to hire independent legal counsel.

## DISCUSSION

The Plaintiffs have waived their RICO claims (Pls.' Am. Resp. 49 n.8, ECF No. 433) and conversion and theft claims (Pls.' Surreply 4, ECF No. 443). The Defendants' and Plaintiffs' cross motions for summary judgment address the following claims: (1) legal malpractice and negligence (Count 19); (2) violations of § 10(b) of the Securities Act of 1934 and Rule 10b-5 and of Indiana and Michigan securities laws (Count 4); (3) fraud (Count 10); and (4) civil conspiracy (Count 14).

### A.     Legal Malpractice and Negligence

### 1.     *Statute of Limitations for Legal Malpractice*

Both parties agree that Indiana's two-year statute of limitations applies to the Plaintiffs' legal malpractice claim. *See, e.g., Bacompt Sys., Inc. v. Ashworth*, 752 N.E.2d 140, 145 (Ind. Ct. App. 2001) (holding that the two-year statute of limitations found in I.C. § 34-11-2-4(2) applies to claim for breach of fiduciary duty as a tort claim for injury to personal property); *Klineman, Rose, Wolf, P.C. v. N. Am. Lab. Co.*, 656 N.E.2d 1206, 1208 (Ind. Ct. App. 1995) (holding two-

year statute of limitations found in I.C. § 34-1-2-2(1) applicable to legal malpractice claims); *Butler v. Williams*, 527 N.E.2d 231, 233–34 (Ind. Ct. App. 1988) (finding that two-year statute of limitations found in I.C. § 34-1-2-2(1) applied to negligence claim). Legal malpractice actions are subject to the discovery rule, which means that the statute of limitations does not begin to run until the plaintiff knows, or in the exercise of ordinary diligence could have discovered, that he has sustained an injury as the result of the tortious act. *Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1991).

The Defendants assert that the Plaintiffs did not file their claim for legal malpractice against them within two years after discovering that they allegedly failed to properly represent the Plaintiffs in drafting company formation documents and a generic promissory note. The Defendants contend that the statute of limitations expired, at the latest, on June 23, 2007, two years after Beaman completed his work for Seybold by drafting the promissory note. Although the Plaintiffs initiated this lawsuit on October 26, 2006, well within the statute of limitations, the original lawsuit did not name White, Beaman, or the Law Firm. The Second Amended Complaint, filed on November 16, 2006 (still within the statute of limitations), named White, but did not include Beaman or the Law Firm. The Third Amended Complaint, filed on April 27, 2007 (still before the expiration of the statute of limitations) added Beaman. It also named "Johnson & Beaman" as the law firm with which Beaman was believed to be associated. The Law Firm, which is now named Johnson, Beaman, Bratch & White, LLP, argues that it was not sued until the Fourth Amended Complaint, which the Plaintiffs filed on August 1, 2007, in response to a successful motion for a more definite statement.

Even if the discovery rule does not bring the August 1, 2007, filing within the statute of limitations, Rule 15(c)(1)(C) does. Under the Federal Rules of Civil Procedure, an amendment to a pleading relates back to the date of the original pleading when:

> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P 15(c)(1)(C); *Krupski v. Costa Crociere S. p. A.*, 130 S. Ct. 2485, 2493 (2010). The purpose of relation back is to "balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits." *Krupski*, 130 S. Ct. at 2494; *see also Joseph v. Elan Motorsports Techs. Racing Corp.*, 638 F.3d 555, 558 (7th Cir. 2011) (stating that "public policy expressed in a statute of limitations is . . . not undermined by relation back in the circumstances specified in [Rule 15(c)(1)(C)]" because "[a] party who is on notice long before the statute of limitations expires that he is an intended defendant, and who suffers no harm from the failure to have been named as a defendant at the outset, is in the same position as a defendant sued within the statute of limitations").

The Fourth Amended Complaint satisfies Rule 15 relation back. First, the amendment changed the name of the Law Firm to reflect the current name of the firm with which Beaman was associated. Second, the amendment asserted a claim "that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Third, the Law Firm received notice of the action within the period provided

by Rule 4(m) for serving the summons and complaint and was not prejudiced in defending on the merits. Finally, the Law Firm knew or should have known that the Plaintiffs would have named it, and not Johnson & Beaman, in the Third Amended Complaint but for a mistake concerning its identity. Accordingly, the statute of limitations is not a bar to the Plaintiffs' legal malpractice claim.

**2.      *Elements of Cause of Action for Legal Malpractice and Negligence***

The three elements of the tort of negligence are: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff resulting from the defendant's breach. *Cox v. N. Ind. Pub. Serv. Co.*, 848 N.E.2d 690, 696 (Ind. Ct. App. 2006). Legal malpractice occurs when an attorney is hired, the attorney breaches the duty created by his employment by failing to exercise ordinary skill and knowledge, and the negligence is a proximate cause of the plaintiff's damages. *Rice v. Strunk*, 670 N.E.2d 1280, 1283–84 (Ind. 1996). In their briefs before this Court on the cross motions for summary judgment, the Plaintiffs separate their legal malpractice and negligence claims into two distinct causes of action, asserting that the latter is viable even if no attorney/client relationship was formed that would create the duty of care necessary for a legal malpractice claim. The Plaintiffs argue that, "[c]learly, the same reasons that support the existence of an attorney/client relationship" also support the existence of a duty on behalf of the Defendants to inform the Plaintiffs that no attorney/client relationship existed or to act in the best interests of the Plaintiffs. (Pls.' Am. Resp. 71, ECF No. 433.)

The tort of professional malpractice has no more legal elements than other negligence torts. *See Campbell v. Eckman/Freeman & Assocs.*, 670 N.E.2d 925, 931 (Ind. Ct. App. 1996) (medical malpractice case) (citing *Burke v. Capello*, 520 N.E.2d 439, 441 (Ind. 1988)). To determine whether a duty exists, which is one of the essential elements of a negligence claim, Indiana courts consistently apply a balancing test:

> Whether the law recognizes any obligation on the part of a particular defendant to conform his conduct to a certain standard for the benefit of the plaintiff is a question of law exclusively for the courts. *Hooks SuperX, Inc. v. McLaughlin*, 642 N.E.2d 514, 517 (Ind. 1994). Three factors must be considered and balanced in order for a court to impose a duty: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns. *Webb v.* [*Jarvis*], 575 N.E.2d [992,] 995 [(Ind. 1991)]. Such duty of care will be found by the courts where reasonable persons would recognize it and agree that it exists. In the absence of the existence of a duty, there can be no negligence.

*Campbell*, 670 N.E.2d at 931 (some citations omitted). In this case, the first *Webb* factor to be considered in the analysis of whether the law recognizes any obligation on the part of the Defendants to conform their conduct to a certain standard for the benefit of the Plaintiffs, i.e., the relationship between the parties, is the same as whether an attorney/client relationship was created. *See Rice*, 670 N.E.2d at 1284 (stating that it would not be necessary to reach the second and third factors of the *Webb* analysis unless there was first an attorney-client relationship). The Court will treat the legal malpractice and negligence claims as a single tort.

The Defendants argue that none of the elements of negligence, beginning with the existence of an attorney-client relationship, can be established. "Duty being the threshold requirement, a plaintiff must first prove the existence of an attorney-client relationship." *Hacker v. Holland*, 570 N.E.2d 951, 955 (Ind. Ct. App. 1991). "The [attorney-client] relationship need not be express; it may be implied from the conduct of the parties." *Id.*; *see also Matter of*

*Anonymous*, 655 N.E.2d 67, 70 (Ind. 1995) (holding that the creation of an attorney-client relationship is not dependent upon the formal signing of an employment agreement or the payment of fees). However, the relationship is consensual and can only exist after both the attorney and the client have consented to its formation. *Id.*; *Matter of Kinney*, 670 N.E.2d 1294, 1297 (Ind. 1996). A would-be client's unilateral belief is not sufficient to create an attorney-client relationship. *Hacker*, 570 N.E.2d at 955. Attorney-client relationships have been implied where a person seeks advice or assistance from an attorney, the advice pertains to matters within the attorney's professional competence, and the attorney gives the sought after advice or assistance. *Matter of Anonymous*, 655 N.E.2d at 70 (citing cases from other states). "An important factor is the putative client's subjective belief that he is consulting a lawyer in his professional capacity and on his intent to seek professional advice." *Id.*

The Defendants' representation of Seybold and his corporate entities did not, by itself, create a relationship with potential investors. Typically, when a lawyer represents a corporation, his duty is to the corporation, not to its individual officers, shareholders, or members. *See Cutshall v. Barker*, 733 N.E.2d 973, 981 (Ind. Ct. App. 2000); Ind. St. R. Prof. Conduct 1.13; *see also United States v. Keplinger*, 776 F.2d 678, 701–02 (7th Cir. 1985) (finding no attorney-client relationship between corporate counsel and the individual employees of the corporation where no express agreement for individual representation was made, and employees never asked the attorneys directly or indirectly to represent them individually, sought individual legal advice, asked questions related to personal representation, or made statements in confidence to the attorneys).

However, the Court must still consider whether others factors are present to create the relationship. *See Rice*, 670 N.E.2d at 1288 (holding that even though no attorney-client relationship existed by virtue of the attorneys' representation of the partnership did not mean that it could not arise in some other way). These factors include the beliefs of the Defendants and of the investors. For their part, the Defendants believe that they represented Seytron Property and Seytron Investors. They deny ever representing any of the Plaintiffs, and there is no evidence that they gave actual consent to the formation of an attorney-client relationship with any of the individual investors, most of whom they never met.

On the other side, the Plaintiffs rely on White's representations during the first seminar to establish an attorney-client relationship. The Court must put White's statements in context to determine whether a reasonable jury could find that the Plaintiff's reasonably believed that the statements created an attorney-client relationship. The representations the Plaintiffs point to were made before any corporations had been formed and before any investors had supplied money. White made comments pertaining to counsel's anticipated formation of corporate entities in such a way that investors would not be subject to personal liability and could avoid securities issues. White told attendees at the first seminar that potential conflicts of interests and competition with Seybold's other projects would be addressed in the operating agreements, commented about the structure of the companies to avoid SEC red tape to save money, and stated that the companies would be set up and run like limited liability companies, which would protect the investors from personal liability. The Plaintiffs also point to White's failure to correct Seybold as evidence in support of their understanding that the Defendants were their lawyers. Seybold told the potential investors at the first seminar that it was important for them to remember that the attorneys did

not just represent him, but represented Seytron Holding, which meant that they represented all the investors, including himself. Seybold wanted the potential investors to know that the attorneys were setting up the companies not to benefit him only and leave the investors without protection.

In this context, the plain implication of White's and Seybold's representations was that the attorneys would be concerned with protecting the potential investors, including Seybold, when they formed the limited liability companies through which the investment plan would be implemented and managed. It would not be reasonable for a potential investor in attendance to believe that, based on these comments, White intended to represent his or her personal interests aside and apart from the creation and structuring of the investment companies.[6] When recalling representations from the first seminar, Mr. Rosenbaum stated that Seybold assured the potential investors that the Law Firm and White represented the investors and would be looking out for their best interests and advising the company, and that White did not correct or qualify these

---

[6] The Plaintiffs allege that White admitted during his deposition that it would be reasonable for the potential investors to believe that they had an attorney-client relationship with the Defendants. The page of the deposition the Plaintiffs cite in support of this assertion contains the following testimony:

Q. But when you hear—as a third party, watching the tape, when you hear Chad Seybold say three errors about what you're there to do: You're protecting their interest. It's not just him. You represent Seytron Properties. He represents you. He is working for me just like he is working for you. You don't see the attorney on the tape which is you saying, whoa, whoa, whoa. I don't represent the company. I want to make clear I don't have an attorney-client relationship with anybody. *Could you see how a person could believe that we're giving money to the company. And the company spending money on the attorneys, I think he is my attorney?* Do you think that would be completely unreasonable?

A. *I don't see that, no.*

(White Dep. 232 (emphasis added).) The problem with the Plaintiffs' reliance on this excerpt is that counsel asked more than one question but only received one answer. The italicized portion of the deposition demonstrates that White's answer can be read with the opposite outcome from the one argued by the Plaintiffs. Moreover, when White's answer is considered in conjunction with the rest of his testimony, it is evident that he does not believe that a person attending the seminar could believe that White was his personal attorney.

statements. Mr. Rosenbaum believed, from representations made at the seminar, that the Defendant had provided information regarding securities laws to Seybold that was for the benefit of the company and they were helping him set up his investment company. (Rosenbaum Dep. 49–50, ECF No. 427-15.) Mr. Rosenbaum's statement show that he understood that White had provided legal advice to Seybold in the context of forming the companies through which he intended to operate the investment plan. Mr. Rosenbaum was also aware that no one had yet invested in the plan, thus any statements about representing investors' interests, if it was to be taken to mean that he would represent the interests of specific individuals, could only refer to future actions and be based on future interactions.

In addition to the seminar, Whang highlights his meeting with the Defendants before the first seminar as evidence of an attorney-client relationship. Going into the meeting, Whang understood from Seybold that the attorneys would be preparing the documents and protecting all of their interests. When asked during his deposition to describe any representation the Defendants made during the meeting, the following exchange took place:

> A. Okay. Chad said I want you to go and meet the legal team that he hired.
> Q. That's what he told you?
> A. That's what he told me and these were the people that were going to draw up all the documents, make sure everything was proper and represent the group so that we would have representation and be just—and feel like we were covered.
> Q. This is all stuff Chad told you?
> A. That's correct.
> Q. Okay.
> A. Uh-huh.
> Q. What else did he tell you about the legal team?
> A. That's about it and then we—then I met them.
> Q. Okay. Let's talk about that.
> A. Okay.
> Q. You went to their office?
> A. Yes.
> Q. How were you introduced?

A. I guess, Beau and Jim, this is Victor.

Q. Tell me what you remember about the meeting in as much detail as you can remember.

A. We didn't stay there a long time. We did sit down, I think, in their conference room. It was early morning. There was nobody else there and basically the conversation was this is Victor, he's part of the investment team. I wanted him to meet you guys to see who was representing them and us, us meaning Chad, and I don't remember a whole heck of a lot more than that.

Q. What else do you remember about that?

A. They were real nice.

Q. Nothing specifically that was talked about?

A. No, because Chad only wanted me to go there to meet them.

Q. Okay.

A. He had already done all of the negotiation. I said—well, there was something brought up about the paperwork. You guys are the ones that are drafting the documents and things like that. So when I went there, I kind of reiterated that and they said yes and other than that, that's about it.

Q. Do you recall any other part of that meeting?

A. Only the fact that when I went there, I went there with the understanding that they were drawing up the paperwork and representing the group of investors or whoever was going to be investing in this plan because at that time we had not raised any money.

Q. And that understanding that you had came from your conversations with Chad; correct?

A. That's correct.

Q. Did anybody else tell you anything that led you to that understanding, besides Chad?

A. I asked them, I basically said so you are the guys that are taking care of us and basically the answer was yes.

Q. You said basically, you don't recall with specificity what was said?

A. Exactly but my understanding was affirmative.

Q. It was your understanding from the meeting with them at their office?

A. Correct.

Q. Or did that understanding come sometime later or before that?

A. Well, from Chad originally and then after I met them and when I walked out of there I was convinced that they were the people that we were going to be standing behind or standing behind us.

Q. Based on what Chad had told you previously and your conversation with them on that particular day, that they were going to be the people standing behind you? You said you were convinced after you left that meeting that they were going to be the people standing behind you?

A. That's correct.

Q. That was based on what Chad had told you previously and your meeting with them that morning?

A. That's correct.

(Whang Dep. 74–77, ECF No. 427-27.) Again, the context of these statements, and thus their implication, relates to drafting the investment documents for the companies. Whang's specifically asked whether they were the guys "drafting the documents and things like that" and were the guys "taking care of us." There is no indication that the Defendants communicated that they would be representing Whang's personal interests aside and apart from creating and structuring the investment companies through which Seybold would manage the investments and the real estate.

The other Plaintiffs not in attendance at the first seminar only heard about the Defendants from Seybold or Whang. Seybold told various potential investors that he had attorneys handling things, attorneys were drafting the paperwork, he hired legal counsel to represent everyone and not just himself, and he had a good and reliable law firm to protect their interests. It would not be reasonable for a potential investors to believe, based on these comments and their variations, that they had hired lawyers to protect their own personal interests. Whang's comments were similar in nature. Sexton recalls that Whang told him that lawyers would be representing the Seybold companies and would be there to represent all of them and help manage their business and protect their interest. It is relevant to note that the Plaintiffs did not sign engagement agreements or contracts for representation, receive bills for services, or pay the Defendants.

The relationship, then, could have only formed if the Defendants allowed the Plaintiffs to rely on them and effectively consented to the formation of an attorney-client relationship. *See Lycan v. Walters*, 904 F. Supp. 884, 908 (S.D. Ind. 1995). Beaman did not meet with any of the Plaintiffs except Whang. White made comments to potential investors at Seybold's first seminar

and was introduced to others at various dates and times. With the exception of talking to White briefly, these Plaintiffs admit that they did not receive any communications from the Defendants or speak to them on the phone. None of the Plaintiffs asked the Defendants for individual advice with regard to their investments or told them anything in confidence. The Defendants did not even know the identity of persons who eventually invested. The Seytron Investors Operating Agreement stated that a member's signature meant that the member had read the Operating Agreement in detail and had the opportunity to review it with his or her legal counsel or accountant. Nowhere did the Operating Agreement identify White, Beaman, or the Law Firm. Under these set of facts, the Defendants did not allow the Plaintiffs to rely on them and thus consent to the formation of an attorney-client relationship. Without this relationship, there was no duty owing by the Defendants to the Plaintiffs and no reasonable jury could find for the Plaintiffs on their claims of negligence and malpractice.

**B.     Fraud**

To prevail in an actual fraud claim under Indiana law, the plaintiff must prove the following elements: (1) a material misrepresentation of past or existing fact which (2) was untrue (3) was made with knowledge of or in reckless ignorance of its falsity (4) was made with the intent to deceive or induce the plaintiff to act (5) was rightfully relied upon by the complaining party, and (6) which proximately caused the injury or damage complained of. *Lawyers Title Ins. Corp. v. Pokraka*, 595 N.E.2d 244, 249 (Ind. 1992); *see also Rex E. Breeden Revocable Trust v. Hoffmeister-Repp*, 941 N.E.2d 1045, 1053 (Ind. Ct. App. 2010).

The elements of constructive fraud are: (1) a duty owing by the party to be charged to the complaining party due to their relationship (2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists (3) reliance thereon by the complaining party (4) injury to the complaining party as a proximate result thereof, and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Demming v. Underwood*, 943 N.E.2d 878, 892 (Ind. Ct. App. 2011) (citing *Rice*, 670 N.E.2d at 1284); *Wheatcraft v. Wheatcraft*, 825 N.E.2d 23, 30 (Ind. Ct. App. 2005).

The Plaintiffs allege that White committed both actual and constructive fraud when he failed to inform the potential investors that he was not their counsel, that his role was not to look out for their best interests, that his role was not yet defined at the time of the first seminar, that he did not have business and securities law experience, that he did not understand the investment plan, and that the investors should obtain their own independent legal counsel. The Plaintiff argues that White's intent to deceive is evidenced by his attendance at the first seminar despite lacking any understanding of the investment plan or having the appropriate experience, yet making it appear that he understood the plan and was experienced and that his group would be handling the structuring of the plan and could insure the investors' protection. The Plaintiffs argue that the representations and omissions were made so that Seybold could attract and obtain investors. The Plaintiffs assert that they justifiably relied upon the representations, and that the omission proximately resulted in their injury.

A claim for actual fraud must be based on a false material representation of past or existing fact and thus cannot be based on omissions. White's affirmative representations fail to

support a claim for actual fraud. All of the statements White made in the seminar for potential investors refer to future action. White explained, in response to a question about potential conflicts of interest and competition with Seybold's other projects, that those issues could be handled by inserting certain clauses into the Operating Agreements. He talked about how a line of credit might work and about the possibility of using CD's as security. White also told the group that he and Beaman had found a way to structure the companies to avoid SEC entanglements, but indicated that they were still looking into that issue. In answer to a question about exposure to personal liability, White assured the group that because any companies would be set up and run as limited liability companies, and it was extremely difficult in Indiana to pierce the corporate veil, investors risked losing only their investment. Actual fraud may not be predicated upon "representations of future conduct, broken promises, or representations of existing intent that are not executed." *Ruse v. Bleeke*, 914 N.E.2d 1, 10 (Ind. Ct. App. 2009); *see also Heyser v. Noble Roman's Inc.*, 933 N.E.2d 16, 19 (Ind. Ct. App. 2010). In addition, to have the force and effect of a fraudulent misrepresentation, a representation must be unqualified. *Bischoff Realty, Inc. v. Ledford*, 562 N.E.2d 1321, 1324 (Ind. Ct. App. 1990). At the time he made the challenged representations, White did not even know if Seybold would follow through with his plan for the Law Firm to draft formation documents. (White Dep. 219, ECF No. 427-29.) There were no LLCs yet formed, and nothing for anybody to invest in. At most, White's comments were representations of future conduct (formation and structure of the LLCs) and representations of existing intent that were not executed (inclusion of certain clauses in the operating agreement). Such statements cannot support a claim for actual fraud and the Defendants are entitled to summary judgment.

The Defendants are also entitled to judgment as a matter of law on the constructive fraud claim. A plaintiff alleging constructive fraud has the burden of proving that the defendant owed him a duty by virtue of their relationship and that the defendant gained an advantage at the expense of the plaintiff. *Demming*, 943 N.E.2d at 892. For the reasons already stated, White did not have a duty to the Plaintiffs by virtue of an attorney-client relationship. In addition, the Plaintiffs have not designated any evidence to suggest that White, Beaman, or the Law Firm gained an advantage at the expense of any of the Plaintiffs. There is no evidence that the Defendants solicited investors themselves, were made aware of individuals who invested with Seybold, managed the entities or funds, were paid according to the number of investors or amount of money invested, had any interest in investment properties, or performed additional legal work for Seybold on the basis of any investments he obtained. According to invoices submitted to Seybold, the Defendants last performed legal work for Seybold in June 2005 when Beaman talked to Seybold about preparing a promissory note and emailed a draft note to Seybold.

Because even when the facts are viewed most favorably to the Plaintiffs no rational fact finder could return a verdict in favor of the Plaintiffs and against the Defendants for fraud or constructive fraud, the Defendants are entitled to judgment as a matter of law.

**C.      Civil Conspiracy and Securities Violations**

The Plaintiffs did not name the Defendants in Count 4 of the Fourth Amended Complaint, which alleges violations of securities laws. However, in Count 14 the Plaintiffs allege that to the extent the Defendants, by concerted action, worked with Seybold to perpetuate

the fraudulent investment scheme, they are liable to the Plaintiffs for civil conspiracy. (Fourth

Am. Compl. ¶ 211 (Count XIV).) The Plaintiffs claim that, pursuant to the conspiracy count, the

Defendants were incorporated by reference into Count 4 for their role in the fraudulent scheme.

(Pls.' Statement of Jurisdiction 3, ECF No. 463.)[7] In response to an interrogatory asking the

Plaintiffs to identify the causes of action they were alleging against White, Beaman, and the Law

Firm and to provide the facts and legal authority which they allege support the cause of action,

the Plaintiffs stated the following with respect to the civil conspiracy claim:

> While it is not clear at this time whether Seytron Counsel has "intentionally" conspired to commit the numerous improper activities as alleged throughout the Complaint against the Plaintiffs, it is clear that, based on the facts alleged herein, Seytron Counsel played a major role in setting up a scenario in which Chad could manipulate the companies in any manner he wished to the detriment of the Plaintiffs. If evidence exists to suggest that your clients intentionally did this, then they are liable for civil conspiracy under Count [14] of the Complaint as to Counts 4, 5, 6, 7, 8, 9, 10, 11 and 12. The basis for this claims stems out of the communications arising out of the videotaped seminar at which White communicated to many of the Seytron Investors that the Investment Scheme was set up to avoid the red tape of securities laws and the work product produced by the Seytron Counsel. Evidence is still in the process of being discovered with regard to this cause of action and supplementation will occur.

(Pls.' Fourth Am. Resp. to Defs' Beau Jack White, James Thomas Beaman, and Johnson &

Beaman's Interrogs. to Pls. 14, ECF No. 427-2.)

"A 'civil conspiracy is defined as a combination of two or more persons, by concerted

action, to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful,

by unlawful means.'" *Goetzke v. Ferro Corp.*, 280 F.3d 766, 777 (7th Cir. 2002) (quoting

*Huntington Mortgage Co. v. DeBrota*, 703 N.E.2d 160, 168 (Ind. Ct. App. 1998)); *see also*

---

[7] The Plaintiffs also assert that the malpractice count confirms that they intended to assert a claim against the Defendants for violation of securities laws. Specifically, in ¶ 237, they allege that the Defendants "breached their duties owing to the Plaintiffs by failing to comply with applicable federal and state laws surrounding the sale of securities." (Fourth Am. Compl. ¶ 237, ECF No. 168.)

*K.M.K. v. A.K.*, 908 N.E.2d 658, 663 (Ind. Ct. App. 2009). Allegations of a civil conspiracy are just another way of asserting a concerted action in the commission of a tort. *K.M.K.*, 908 N.E.2d at 664. In its Motion for Summary Judgment, the Defendants argue that the Plaintiffs have admitted that they have no evidence of their participation in a conspiracy. They also argue that for reasons stated in their earlier arguments relating to the Plaintiffs' claims for fraud and for violations of securities laws, the Plaintiffs cannot prove the essential elements of a civil conspiracy claim. The Plaintiffs did not address the conspiracy allegation in their response to the Defendants' Motion for Summary Judgment and asserted in later briefing that Rule 56 only requires a response where the movant has first shifted the burden through the presentation of admissible evidence, and that the Defendant's bare legal conclusion was not sufficient to shift the burden.

The Plaintiffs' argument that the Defendants are not entitled to summary judgment because they "failed to put forth a single shred of evidence that [they] did not conspire with Seybold" ignores that it is the Plaintiffs who carry the burden. (Pls.' Surreply 5, ECF No. 443.) "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). A party seeking summary judgment need not support its motion with affidavits or other similar materials negating an opponent's claim, but only need point out that there is an absence of evidence supporting the non-movant's case. *Id.* at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B) & Notes to 2010 Amendments (recognizing that a party need not always point to specific record materials because "a party who does not have the trial burden of production may rely on a showing that a

party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").

The Plaintiffs bear the burden of establishing that the Defendants engaged in a civil conspiracy, and the Defendants' Motion sufficiently shifted the burden to the Plaintiffs to present evidence probative of their claim that the Defendants acted in concert with others to accomplish an unlawful purpose. Although the Defendant could have included a more detailed analysis, its position regarding the conspiracy claim was clear. In addition, the Defendant specifically incorporated previously articulated argument when it stated that the Plaintiffs' failure to establish a triable issue of fact with respect to the underlying torts made it impossible to establish conspiracy. This was appropriate given, as the Court stated earlier, that allegations of a civil conspiracy in Indiana are just another way of asserting a concerted action in the commission of a tort. Moreover, the evidentiary materials provided to the Court show that Seybold hired the Defendants to perform the legal work concerning formation of two companies that Seybold intended to use to operate a real estate investment plan, and that the Defendants formed the companies in a manner that they believed would allow Seybold and his investors to avoid securities entanglements. There is no evidence that, in doing so, they planned to carry out an unlawful purpose or to accomplish some other purpose by unlawful means. Thus, to proceed further on its conspiracy claim, the Plaintiffs were required to come forward with evidence that would allow a jury to find otherwise. The Plaintiffs' own arguments are that White did not have experience in business or securities laws and that he did not understand the structure of the investment plan. Accordingly, even if the Court assumed for the sake of argument that the Defendants committed the underlying tort, there is no evidence creating a genuine dispute that

they did so through concerted action. The Defendants are entitled to summary judgment on the civil conspiracy claim.

**D.** **Securities Violations**[8]

The Plaintiffs assert that the Defendants violated § 10(b) of the Securities Act of 1934, which makes it unlawful for "any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails, or any facility of any national securities exchange . . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j. The Securities Act of 1934 was designed to protect investors against manipulation of stock prices. *Basic Inc. v. Levinson* 485 U.S. 224, 230 (1988) (citing S. Rep. No. 73-792, at 1-5 (1934)). The Plaintiffs also allege violations of Rule 10b-5, which the Securities and Exchange Commission adopted to further describe the conduct that is prohibited:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

---

[8] When the bankruptcy court ordered a relief from the stay of the Plaintiffs' claims against White, it limited the relief to the claims against White that were covered by his malpractice liability insurer. The parties have not indicated whether this relief extends to the securities violations. However, because the Court finds no genuine issue of material fact related to this claim, the Court need not resolve the issue.

*See* 17 C.F.R. § 240.10b-5(b). Rule 10b–5 encompasses only conduct already prohibited by § 10(b). *United States v. O'Hagan*, 521 U.S. 642, 651 (1997).

In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), the Supreme Court held that section 10(b) of the Securities and Exchange Act of 1934 does not reach aiding and abetting because it makes no reference to secondary liability. Recently, the Supreme Court held that, "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011) (holding that one who prepares or publishes a statement on behalf of another is not the maker). Although suits against entities that contribute substantial assistance to the making of a statement may be brought by the SEC, 15 U.S.C. § 78t(e), private parties may not bring such suits. *Id.*; *Central Bank*, 511 U.S. at 180.

Accordingly, to survive summary judgment, the Plaintiffs must show a genuine issue of material fact with respect to the statements or omissions that can be directly attributed to the Defendants. In their briefs to this Court, the Plaintiffs allege that the Defendants committed securities violations through White's conduct at the first seminar as follows:

> White omitted to state material facts by failing to inform the Seytron Investors that Seytron Counsel was not counsel for the Seytron Investors (if White so believed), that the role of Seytron Counsel was not to look after the best interests of the Seytron Investors and their Investments (if White so believed), that White was not aware of his role as Seytron Counsel at the First Meeting despite his representations that he would insure that the Seytron Investments Companies would be run properly, that he had no experience whatsoever in business or securities laws despite his representations and/or affirmations thereof that the Seytron Investments Scheme was structured to avoid securities laws and that "his" group would be handling the structuring of the Seytron Investment Scheme, that he didn't understand the Seytron Investment Scheme at the time he attended the First Seminar despite his addressing

issues and concerns relating to the same, and that Seytron Investors should obtain their own independent legal counsel.

(Pls.' Am. Resp. 74, ECF No. 434.)

For a violation of § 10(b) or Rule 10b-5 to be based on an omission, the plaintiff must show that the defendant owed some sort of duty because "there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 235 (1980). The Plaintiffs argue that the duty element is satisfied because the Defendants were acting as the Plaintiffs' legal counsel. This Court has already concluded that the Defendants did not have an attorney-client relationship with the individual Plaintiffs. In addition, the omissions were not material. Whether a statement is material depends on how it affects an investor's perception of the security. If the court determines that there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information, the statement or omission is material. *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). White's comments at the first seminar were negligible in light of the overall mix of information presented. The operating agreements, the private offering, and Seybold's statements made up the majority of the information presented to potential investors. The Operating Agreement for Seytron Investors stated in bold type before the signature lines that the signors certified that they had read the Operating Agreement in detail and had the opportunity to review it with their legal counsel and/or accountant. Moreover, all of White's statements were made in the context of performing legal work for Seybold's entities, not as counsel for the individual investors. Thus, regardless of whether he clarified this point or whether the seminar attendees were mistaken regarding White's level of expertise or involvement, a reasonable investor would seek to understand the facts and risks of investing, and

the overall structure of the investment. Indeed, White's statements and omissions had nothing to do with the nature of the risk involved in rehabilitating homes in Marion, Indiana. To the extent these Plaintiffs chose to rely on the representations of Seybold regarding the strength of the investment, White's omissions regarding his role drafting corporate documents are immaterial. Many of the Plaintiffs invested with Seybold without any regard for White's involvement, most having never met him and some having never heard of him. No reasonable jury could find it substantially likely that a reasonable investor would find White's omissions material in the total mix of information about the investment.

A plaintiff alleging securities fraud must also prove that the defendant acted with scienter, "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 & n.12 (1976)). Here, the Plaintiffs ask the Court to find an issue of fact regarding White's intent to deceive because he made it appear as if he understood the investment plan and was experienced in business and securities laws when he was not. The Plaintiffs argue that White was motivated by a desire to appear competent to serve as counsel so that he could ensure that Seybold attracted investors. This allegation regarding White's motive has no basis in fact. The Defendants were not made aware of individuals who invested with Seybold, did not manage the entities or funds, were not paid according to the number of investors or amount of money invested with Seybold, did not have any interest in investment properties, and did not perform additional legal work for Seybold on the basis of any investments he obtained. The Plaintiffs have not pointed to a single "concrete benefit[ ] that could be realized by" the alleged "wrongful nondisclosures." *See Ind. Elec. Worker's Pension Trust Fund IBEW v. Shaw Grp.,*

*Inc.*, 537 F.3d 527, 543 (5th Cir. 2008) (stating that "alleging facts that lead to a strained and tenuous inference of motive is insufficient to satisfy the pleading requirement"); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999). There is simply no evidence that when White informed the potential investors that potential conflicts of interest and competition with Seybold's other projects would be handled in the Operating Agreements, that he and Beaman had found a way to structure the companies to avoid SEC entanglements, and that any companies formed would be set up and run as limited liability companies so that the only money the investors risked losing was their investment money, that White intended to deceive, manipulate, or defraud the Plaintiffs.

The Plaintiffs also allege that the Defendants violated Indiana and Michigan securities laws. Because the Plaintiffs rely on the same omissions and the same argument in support of the state law claims, the outcome—summary judgment in favor of the Defendants—is also the same.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants Beau Jack White, James Thomas Beaman, and Johnson, Beaman, Bratch & White, LLP's Motion for Summary Judgment [ECF No. 410] and DENIES the Plaintiffs' Amended Countermotion for Summary Judgment [ECF No. 434]. The Clerk will enter judgment in favor of Defendants Beau Jack White, James Thomas Beaman, and Johnson, Beaman, Bratch & White, LLP and against the Plaintiffs.

SO ORDERED on August 30, 2011.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT